**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**DEBORAH L. MORALES,**

                                       **Plaintiff,**

     **vs.**                                                  **5:06-cv-0899**
                                                          **(NAM/ATB)**

**NYS DEPARTMENT OF LABOR, and CNY**
**WORKS, INC.**

                                       **Defendants.**
_____

| APPEARANCES: | OF COUNSEL: |
|---|---|
| Webster, Fredrickson Law Firm | Linda M. Correia, Esq. |
| 1775 K Street NW | |
| Suite 600 | |
| Washington, DC 20006 | |
| and | |
| Cooper, Erving Law Firm | Phillip G. Steck, Esq. |
| 39 North Pearl Street | |
| 4th Floor | |
| Albany, NY 12207 | |
| *Attorneys for Plaintiff* | |
| | |
| Office of Attorney General | David B. Roberts, Esq. |
| The Capitol | Steven H. Schwartz, Esq. |
| Albany, NY 12224 | |
| *Attorneys for NYS Department of Labor* | |
| and | |
| Office of Attorney General | Linda M. Correia, Esq. |
| The Capitol | |
| Albany, NY 12224 | |
| *Attorneys for Defendants* | |
| | |
| Bond, Schoeneck & King, PLLC | Kerry W. Langan |
| One Lincoln Center | Patrick V. Melfi |
| Syracuse, NY 13202 | |
| *Attorneys for CNY Works, Inc.* | |

**Norman A. Mordue, District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

This case arises out of an employment dispute between plaintiff Deborah L. Morales and her former employer, the New York State Department of Labor, Division of Employment Services ("DOL").  Also named as a defendant is CNY Works, Inc. ("CNY"), a non-profit that worked with DOL out of the same Syracuse, New York office to provide employment assistance to Central New York communities.  In her amended complaint, plaintiff alleges that DOL intentionally discriminated and retaliated against her in violation of Title VII of the Civil Rights Act, and that DOL and CNY retaliated against her in violation of Title VI.  Plaintiff is Caucasian and an American citizen, but she claims both defendants violated her rights because she associated with persons of Mexican, Cuban, Puerto Rican, Columbian, Dominican, Ecuadorian, and Honduran national origin.  DOL and CNY move separately for summary judgment dismissing plaintiff's respective claims against them.  Plaintiff has responded to both motions, and both defendants have replied.

## II.    BACKGROUND

A.    The Parties

The parties do not dispute the majority of the facts leading up to the filing of this action, though they dispute the factual basis of plaintiff's numerous informal complaints and her characterization of defendants' actions.  Plaintiff, who speaks fluent Spanish, obtained employment as a Spanish-speaking Labor Services Representative with DOL in February 2000.  Among other things, DOL maintains jobs service offices around New York State that provide employment resources and basic job-search training to the public.  Plaintiff first worked for DOL as a labor service representative at its jobs service office in Syracuse, New York.  At deposition, plaintiff

summarized her responsibilities as such: "Intake interviews, solicitation of information from customers related to employment background and experience, mentoring of job seekers with regard to marketing themselves as a commodity in the job market, which involved consultation on resume preparation and cover letter preparation, [and] coaching preparation for interview[s]."  Plaintiff also trained customers to use Internet-based job search resources.  The parties agree that DOL hired plaintiff in part because it expected her to use her Spanish language skills to provide these services to Spanish-speaking "Limited English Proficiency" ("LEP") customers.  DOL did not permit plaintiff or other labor service representatives to contact most third parties on behalf of any customer, instructing them instead to refer customers to third parties when needed.

CNY is a Syracuse-based nonprofit that began working with DOL to provide access to employment resources in 2004, using funds made available to it and the State through the Workforce Investment Act, 29 U.S.C. § 2801 *et seq.*  DOL moved its Syracuse jobs service office into a building on Franklin Street in Syracuse that CNY owned and operated.  Their combined services constituted the Syracuse "One Stop" Center, one of several One Stop locations across New York State, where local residents could take advantage of the resources CNY and DOL offered in one visit.  As part of the arrangement, CNY had control over customer intake, meaning that its employees generally determined whether customers should be diverted to DOL staff.  The Syracuse One Stop also featured a "resource room," where customers could go to use one of several public computers or to speak with a member of CNY or DOL staff.

After relocating to the CNY office space, DOL reassigned plaintiff's workstation to a cubicle in the resource room. Plaintiff no longer conducted intake interviews, but she continued to meet with customers to provide employment assistance and help using DOL resources.  Plaintiff

3

and other resource room staffers conducted group orientations to give an overview of resource

room and One Stop tools to new customers who had already gone through an intake interview.

Initially, plaintiff maintained her role as an LEP specialist, and even translated to help other staff

members interact with Spanish-speaking LEP customers.  Plaintiff emphasizes in her responses,

supporting affidavits, and other record evidence, however, that her role in assisting LEP customers

at the One Stop varied from day to day.  As she put it at deposition,

> [M]y role was redefined . . . in such a way as to provide an obstacle and hinderance
> [sic] to that category of customer. . . . It was touch and go.  It was on a shoestring.
> It was flying by the seat of your pants.  It was as if I had a string tied to my nose and
> management yanked it in whichever di[rec]tion they wanted to when they wanted to.
> There was not an established protocol.  My role was designated as primarily equal
> to the duties of the unit that I was assigned to, and then if I was needed to "help a
> Spanish speaking customer," I was called on.

According to plaintiff, CNY and DOL staff use the same computer database to record

customer information.  The database, called the One Stop Operating System ("OSOS"), is also used

at the other One Stop locations around New York.  Plaintiff obtained through discovery a printout

from OSOS, which she has filed under seal in support of her responses.  The printout shows that

staffers at One Stop locations around the state recorded national origin information for at least some

Mexican, Cuban, Puerto Rican, Columbian, Dominican, Ecuadorian, and Honduran customers.

Plaintiff's printout, however, does not specify which One Stop employee or office recorded the

information.

Plaintiff describes the roles of many coworkers, supervisors, and managers from DOL

throughout her response materials.  Those most relevant to this action were: plaintiff's immediate

supervisors Cheryl Kane, and after 2006, Sue Stucco; supervisor Colleen McBride; DOL managers

Cindy Garrett and Betty Youmans; DOL regional administrators Valerie Seawell and Kelli Owens;

DOL Assistant Director of Employee Relations Stacy Hopkins; and New York State Office of Inspector General investigator Ken Dippel.  Plaintiff also interacted with many CNY employees, including Alvaro Valencia and Lori Wilson, CNY manager Manny Martinez, and CNY director Lenore Sealey.

B.    Plaintiff's "Advocacy"

At her deposition, plaintiff testified that her "advocacy" for Spanish-speaking people in the Syracuse area is part of the "fabric of my personality and my character."  As discussed below, plaintiff shifts between characterizing her advocacy as being on behalf of Spanish-speakers, citizens of Spanish-speaking countries residing in the Syracuse area, and more generally, Hispanic communities in the Syracuse area.[1]  Plaintiff alleges that DOL and CNY violated her rights because of this advocacy.

Plaintiff offers evidence indicating that she spent a substantial amount of time at the Syracuse One Stop seeking to remedy perceived shortcomings in DOL and CNY's handling of LEP customers.  Emails plaintiff offers in support of her responses show her, *inter alia*, inquiring about a possible discriminatory job posting residency requirement, offering an extensive critique of One Stop procedures for handling LEP customers in response to a set of proposed changes to DOL and CNY systems, warning supervisors that LEP customers "could not access workshops regarding resume preparation and interviewing skills," and forwarding her concerns about LEP procedures to

_____

[1] Plaintiff offers little evidence other than her own statements to support her contention that the predominant LEP communities in the Syracuse area are of Mexican, Cuban, Puerto Rican, Columbian, Dominican, Ecuadorian, and Honduran descent, and nowhere specifies how often these groups visited the Syracuse One Stop as compared to others.  Alvaro Valencia, the only other deponent who expressed he had any knowledge of the Hispanic communities in the Syracuse area, commented that most Spanish-speaking customers were "from Cuba, [and] Puerto Rico," and that he recognized some customers by their accents as being from Central or South America.

upper management and other divisions within DOL.  Plaintiff asserts that she complained to "the Regional Administrator of DOL, the Director and Assistant Director of DOL's Division of Employment Services[,] . . . the Director of the Division of Equal Opportunity Development[,] . . . the office of the Inspector General and the Office of Employee Relations."  Plaintiff also filed formal complaints regarding LEP policies internally with the Office of Inspector General and externally with the Equal Employment Opportunity Commission.

The consistent thread across plaintiff's numerous complaints about LEP policies and procedures is that, in her view, DOL and CNY constructed barriers — often linguistic in nature — to prevent LEP customers from accessing their resources.  For example, Plaintiff alleges that she volunteered to attend a "Latina Women's Conference" in Syracuse to conduct outreach to Spanish speaking communities on behalf of DOL, but that she was forbidden from doing so.  Plaintiff asserts that DOL and CNY did not have many Spanish language versions of common forms, and that on one occasion they prevented her from putting Spanish language pamphlets in the lobby area. Plaintiff asserts that customers who looked Hispanic or who had Hispanic-sounding surnames were diverted to Alvaro Valencia, a CNY employee fluent in Spanish, even if those customers spoke English.  Further, at deposition, Valencia admitted that he once stated "[i]f [a customer] don't speak English, we don't help them here [at One Stop].  They have to go to the Spanish Action League or to Jobs Plus."  Plaintiff alleges that even though other DOL staff had recognized specialties, her Spanish language proficiency was not put to use as it should have been, and that procedures often forced LEP customers that were diverted to plaintiff to wait much longer than English-speaking customers to receive services.  Plaintiff also provides substantial evidence that indicates she lobbied CNY and DOL to use paid interpreters and "Interpretalk" — a live, fee-based telephonic

interpreting service — with more frequency.

Plaintiff's interpretation of the extent of her duty to assist LEP customers often brought her into conflict with DOL management. As detailed below, DOL criticized or punished plaintiff for exceeding the boundaries of her authorized duties in aiding LEP customers on several occasions, maintaining that she was only authorized to refer LEP customers to third parties. Some of these punishments resulted in disciplinary proceedings known as "interrogations" as outlined further below. Plaintiff admitted in her last interrogation that, in addition to providing referrals, she communicated with third parties on behalf of LEP customers. As plaintiff testified, she felt that helping LEP customers is "not the same ballgame" as helping English-proficient customers. Plaintiff's testimony indicates that she gave more assistance to LEP customers than she was expected to because she felt their language barriers demanded that she provide more assistance dealing with issues peripheral to securing employment. Plaintiff commented at one interrogation that the rule of thumb she was supposed to follow, "to do nothing different for Spanish speaking people that I would do for English speaking people," in her opinion is "illegal," given the greater needs of LEP customers peripheral to obtaining employment.

Plaintiff's involvement with the many Hispanic communities in Central New York was not limited to her service as a member of DOL staff. Plaintiff asserts in her response that she "is of non-Hispanic European descent," but has several "bi-racial/bi-national" Hispanic children by her second husband. Plaintiff was a volunteer/member[2] of the Eastern Farm Workers Association ("the EFWA"), "an organization," she testified at deposition, "with the purpose of organizing low-wage

---

[2] Plaintiff's interrogation and deposition testimony indicates that there is a difference between "members" and "volunteers," but the contours of that distinction and plaintiff's role are unclear.

workers in order to facilitate access to resources . . . [and] establish[ing] networks of support in the community, support of the professional people, doctors, [and] lawyers" for the benefit of members. EFWA is comprised mainly of Hispanic, Spanish-speaking rural workers.  Plaintiff served the EFWA as an interpreter, although she did also receive benefits like food and clothing through it. Plaintiff admitted at deposition and at her interrogations that she communicated with the Murphy Law Firm, which specializes in immigration, provided temporary housing to Hispanic farm workers in 2005, and was friends with "a lot of Mexican Nationals."  At her depositions, plaintiff also testified that she conducted internet research on issues related to her claims and expressed an interest in the technical aspects of immigration law.  Indeed, at her last interrogation, DOL Assistant Director of Employee Relations Stacy Hopkins commented, "I think anyone would agree that [plaintiff is] a terrific advocate for the people that [she] speak[s] with."

C.      Plaintiff's Workplace Disputes

The parties' materials contain numerous references to conflicts spanning the duration of plaintiff's tenure with DOL.  The parties agree on many of the essential facts surrounding each individual incident, but they dispute the relevance and proper characterization of each in light of governing legal principles.

1.      *Conflicts with DOL*

DOL procedure provides supervisors with several formal tools for punishing alleged employee misconduct.  Supervisors may choose to issue a formal "counseling memorandum" — a document memorializing a discussion between a supervisor and an employee in which the supervisor details the employee's improper behavior and outlines applicable rules of conduct. Counseling memoranda do not alter an employee's responsibilities or pay.  DOL argues that

counseling memoranda are "learning tools," whereas plaintiff insists they are punitive in nature.

For more serious infractions, supervisors may choose to initiate an investigation into an employee's conduct that may result in one of several punishments pertinent to the instant action: a counseling memorandum, a formal reprimand, a notice of discipline, or a notice of termination. The record is unclear on the procedure for initiating an investigation, but emails plaintiff offers in support of her responses indicates that a supervisor can request one at his or her discretion. The investigation includes an "interrogation," where management or the New York State Office of Inspector General questions an employee about an incident or infraction in the presence of union representatives. When an interrogation is deemed necessary, the employee is given several weeks' notice through a "notice of interrogation."

A labor agreement with DOL allows employees to dispute a punishment by filing a disciplinary grievance. Plaintiff submits a notice of termination in support of her responses indicating that filing a grievance first results in a meeting between plaintiff and management where the parties may negotiate a different punishment. If an employee is unhappy with the outcome of the grievance meeting, he or she may file for arbitration on the dispute with an arbitrator from the American Arbitration Association. The employee, represented by the union, and DOL attend a hearing before the arbitrator and have the opportunity to present physical and testimonial evidence. Per the labor agreement, DOL and its employees are bound to whatever punishment the arbitrator deems appropriate.

The availability of these formal disciplinary tools does not preclude a supervisor's authority to reprimand an employee verbally, or to use his or her discretion otherwise in managing employee conduct.

a.      Unprofessional Behavior

Plaintiff offers evidence that she came into conflict with her supervisors and coworkers concerning her role as a LEP specialist and the accessibility of DOL's resources to LEP customers "early on" in her tenure.[3]  On March 11, 2004, DOL issued a counseling memorandum to plaintiff describing several incidents that occurred in early 2004.  In the memorandum, plaintiff's supervisor Cheryl Kane describes plaintiff's conduct  as "[u]nprofessional and uncooperative," in that she ignored the DOL chain of command in resolving an issue with a customer, refused a direct order to turn off a tape recorder she had been using to record conversations with her supervisors, and being confrontational with her supervisors.  The counseling memorandum also states that DOL received a letter from a local employer complaining that plaintiff was "acting in a translator's capacity on behalf of a Spanish-speaking" customer, and so it instructed her "to only do for the Spanish speaking customers what [she] would do for the English speaking customers."

b.      Chronic Lateness and Absences

The record indicates that plaintiff often failed to arrive at work on time, but only one period of tardiness resulted in its own formal disciplinary action.  From November 17, 2005 until December 14, 2005, plaintiff was late nine times.  Plaintiff also used or scheduled a significant amount of her annual and sick leave allowance during that period.  Kane issued plaintiff a counseling memorandum on January 24, 2006, detailing plaintiff's absences and warning her about the danger of failing to reserve some leave allowances for unplanned emergencies.

---

[3] Plaintiff submits an email from "early 2001" in support of her responses that she wrote to her then-supervisor Brian O'Neill in which she describes confusion between her and Lynn Woodridge, a coworker, over how to deal with an LEP customer.  In the email, plaintiff alleges that Woodridge was rude to her and insensitive to a customer's language restrictions while also lamenting DOL's lack of Spanish-language intake forms.  No other evidence is dated earlier than 2004.

Despite this counseling memoranda, plaintiff admits that she took at least five extended leaves of absence.  Plaintiff took each extended leave after a work incident, and she characterizes them as being induced by her work-related stress.  Emails between plaintiff and her supervisors indicate that plaintiff also took medication to treat depression, and that this may have played a role in her frequent tardiness.

c.      The State Fair Incident

Plaintiff volunteered to work a DOL booth at the New York State Fair in late August, 2004.  According to testimony plaintiff gave at an interrogation following this incident and again at a deposition related to this action, she brought her young daughter and her daughter's friend with her to the fair.  In an email dated September 14, 2004, Tillman Wilkerson, a DOL staffer who worked the booth with plaintiff, stated that "she continually shook her head and flung he [sic] hair around throughout the shift while customers were present."  Furthermore, when he returned from lunch, Wilkerson states that "the booth was unattended."  Plaintiff admitted at the interrogation that she left the booth to use the bathroom and to retrieve free handouts for her daughter and her daughter's friend.  DOL then issued plaintiff a counseling memorandum based on what plaintiff described at deposition as the "false allegation" that she left the booth unattended.

Plaintiff received a notice of interrogation on October 29, 2004, and attended the interrogation two weeks later on November 15.  DOL issued a counseling memorandum to plaintiff on December 15, 2004, acknowledging plaintiff's objections to the accusations and stating that DOL policy forbade her from leaving the booth unattended and from bringing her children into work.

d.      Anna Johnson Incident

11

The next major incident occurred in the Resource Room on March 15, 2005, when plaintiff was assisting Anna Johnson, a non-LEP customer.  As she described the incident at interrogation and at deposition, plaintiff and Johnson had a series of miscommunications regarding what services Johnson was interested in using.  At some point Johnson handed plaintiff a floppy disk containing her resume.  Plaintiff alleged that she then asked Johnson for her social security number, as she must do with all her customers, but Johnson refused.  Plaintiff admitted that when Johnson demanded to have her floppy disk back, she stated that she would not return it unless Johnson gave her social security number.  Johnson reached over plaintiff's desk, and plaintiff moved her hand to block access to the floppy disk.  Plaintiff admits her hand touched Johnson's, but interrogation testimony shows that DOL accused her of scratching Johnson.  In any case, plaintiff left to summon her supervisor who then resolved the situation.

In connection with this incident, plaintiff was interrogated on April 14, 2005, and issued a notice of discipline suspending her for two weeks without pay on May 26, 2005.  Plaintiff filed a grievance on this punishment in accordance with her labor agreement, and in a written opinion dated March 3, 2006, an arbitrator reduced the punishment to a letter of reprimand, which was issued on April 19, 2006.  Though it threatened future disciplinary action if plaintiff did not "provide fair and courteous treatment" to customers, it did not reduce her pay, change her responsibilities, or otherwise affect her employment status.

e.      The Hospital Advocacy Incident

On October 6, 2005, there was a large propane explosion at a farm in Phoenix, New York, causing injuries to several Spanish-speaking farm workers.  The EFWA summoned plaintiff to Upstate University Hospital in Syracuse, to work as a translator for the victims and their friends and

family.  Plaintiff admitted at the interrogation that she wore a badge at the hospital to identify

herself as an EFWA worker.  While at the hospital, plaintiff saw Ricardo Aguilar, a Rural Labor

Representative with DOL.  Plaintiff admits that she approached Aguilar to ask about immigration

rules, and later followed up for details by email.  At the interrogation, plaintiff insisted that her

questions were born of a personal "interest in immigration."  Plaintiff also admits, however, to have

housed some number of workers displaced by the explosion.

Concerned plaintiff was offering official DOL services or revealing confidential DOL

information to persons she worked with in her capacity as an EFWA member/volunteer, plaintiff's

manager Kelli Owens contacted the New York State Office of Inspector General on October 17,

2005.  Investigator Ken Dippel scheduled an interrogation of plaintiff for December 7, 2005 after

researching the EFWA and investigating plaintiff's email history.  Plaintiff first  claimed that a

miscommunication between her and coworkers caused her to miss a reminder phone call and then

later claimed she simply forgot the date.  In any event, she failed to show up at the scheduled time

for the interrogation.

Dippel summoned plaintiff to a second interrogation on January 13, 2006, which plaintiff

did attend.  Although Dippel asked questions about both her affiliation with the EFWA and her

failure to attend the December 7 interrogation, plaintiff was only punished for failing appear as

required.  DOL issued a notice of discipline to plaintiff on January 16, 2006, suspending her

without pay for four weeks.  Plaintiff challenged her punishment, and through arbitration reduced it

to a one-week unpaid suspension on April 10, 2007.  DOL issued plaintiff a notice of suspension on

April 24, 2007, and she served her punishment on the week of May 7, 2007.  Based on her answers

at the interrogation and its own investigation, the Office of Inspector General found no basis to

believe that plaintiff's work with the EFWA conflicted with her position at DOL.

f.      Scope of Employment, Refusal to Leave the Office, and Personal Email Incidents

Stacy Hopkins, DOL Assistant Director of Employee Relations, interrogated plaintiff on March 2, 2006, about a series of conflicts that arose in February of that year.  On February 13, a married LEP couple identified only as Wilfredo and Catherine met with plaintiff in the resource room.[4]  The couple had a "lot of issues," as plaintiff described at her interrogation, including unemployment, health, housing, and taxation.  Plaintiff admitted that she called the EFWA to inquire about legal resources for Wilfredo and that she called another office in Syracuse "in order to hook him up with whoever could help him with the specifics of his tax return."  Hopkins asked plaintiff whether she faxed or told Wilfredo that he could fax material to the Internal Revenue Service using DOL equipment, but plaintiff denied doing so.  Plaintiff also admitted that she emailed a "Ride-to-Work Program" on behalf of Catherine for two weeks' bus fare "until she gets her first paycheck."  Most of Hopkins' questions on this issue focused on whether plaintiff was acting beyond the scope of her employment by communicating with third parties on behalf of Wilfredo and Catherine, but plaintiff insisted that she did what was necessary in light of their limited English language skills.

Hopkins also interrogated plaintiff about conflicts arising from her habit of staying at the office after her official 4:30 p.m. end time despite being told on numerous occasions not to do so.  On February 14, Kane and plaintiff had a conversation about plaintiff's work hours in which Kane

---

[4] Neither the couple's race nor national origin are clear from the record.  For example, Wilfredo's surname appears in plaintiff's response exhibit 68, but the handwriting is difficult to decipher.  However, the reporter who transcribed the interrogation resulting from this incident recorded that Wilfredo's surname was "something in Spanish, I think," and recorded plaintiff as stating that Wilfredo "swam the Panama Canal" to reach the United States.  The Court will therefore consider Wilfredo and Catherine to be of Hispanic racial and cultural descent for purposes of the instant motion.  *See* note 6, *infra*.

told plaintiff to leave at 4:30 p.m.  Kane began to walk away from plaintiff's desk when plaintiff called back to her.  Plaintiff stated at the interrogation that "[t]he point I made to Cheryl [Kane] was that it's extremely ridiculous . . . that she's focusing on these kind[s] of trivialities" and that "it's extremely tragic that she's focusing on such triviality in the face of customers with real needs . . . [e]specially considering the customer driven environment" at  One Stop.  Hopkins asked plaintiff if she raised her voice or if she was "waving [her] arms about," but plaintiff only admitted to gesturing for emphasis.  Plaintiff further stated that she felt that she was being "singled out in this process," in that Kane was enforcing a "new standard that's never been applied to any other staff."

At 4:40 in the evening on February 14, DOL manager Betty Youmans approached plaintiff at her desk.  Youmans asked plaintiff to leave, and plaintiff admitted that she responded by saying "Aye Aye sir — Aye Aye ma'am, or something like that."  When Hopkins asked if she made that acknowledgement "in a sarcastic way," plaintiff insisted that it was sincere and related to her military background.  Plaintiff admitted that she continued to stay in the office after 4:30 p.m. on "a lot of days," and that on at least one occasion, CNY director Lenore Sealey approached plaintiff at her desk sometime between 6:00 and 6:30 p.m. to tell her to leave.

Hopkins also asked plaintiff whether she discussed confidential information with a coworker in front of a customer on February 22.  Plaintiff admitted that she had discussed one of her arbitration hearings and pending suspension determination with a coworker in front of a customer, and later, discussed "issues surrounding . . . the quality of customer service" at One Stop with another customer.  Plaintiff insisted at the interrogation that her actions were appropriate "because there are continual obstacles that are placed in front of me by Management in my attempts

to accommodate the needs of my customers."

Hopkins also asked plaintiff about her failure to complete a training course as instructed. Plaintiff was instructed to complete a training session by February 28, and when she failed to do so, Kane emailed her on March 1 asking that she complete it by 11:30 that morning.  Plaintiff maintained that a printer issue prevented her from producing a completion certificate for Kane in time, but admitted she still had not completed it as of the interrogation on March 2.

Lastly, Hopkins confronted plaintiff about her use of her DOL email account.  Plaintiff had signed an equipment use agreement with DOL in which she promised not to use DOL equipment for personal purposes.  Hopkins asked plaintiff to explain emails to friends, relatives, private entities, and advocacy groups.  Plaintiff insisted that many were work related, but admitted that she had sent or received each of the correspondences Hopkins asked her about.  Among the emails plaintiff admits to have sent from her DOL account are many that relate to her discrimination complaints, including emails containing workplace discrimination resources, and correspondence with a former employee and an attorney about DOL's practices and policies.

Plaintiff received the notice of interrogation relating to this investigation on February 15, 2006, one day after her encounter with Kane about staying late and two days after she first met with Wilfredo and Catherine.  As a result of the March 2 interrogation, DOL issued plaintiff a notice of termination on November 13, 2006.  Plaintiff responded by filing a disciplinary grievance, but the parties could not come to a resolution.  Plaintiff appealed for arbitration, but submitted a letter of resignation on August 27, 2007, before the arbitration hearing was scheduled.

g.    Summer 2007 Counseling Memos

Between the interrogation and her resignation, DOL issued two counseling memoranda to

16

plaintiff.  First, on June 28, 2007, after a number of LEP customers entered One Stop seeking assistance, plaintiff's supervisor Susan Stucco assigned some to plaintiff and some to another labor services representative.  Plaintiff challenged that decision in front of the customers, and accused the other representative of giving out incorrect information.  Stucco issued a counseling memorandum to plaintiff on July 2, 2007.

Second, on July 18, 2007, plaintiff acted in a rude manner towards Stucco.  In response to Stucco's questions about where one of her clients would be registering for a training program, plaintiff stated that "the customer is an immigrant and does not have their Mercedes available like English speaking customers do."  When Stucco followed up with questions about plaintiff's recent workstation move, plaintiff allegedly "appeared agitated," and began moving around her belongings in a loud and unprofessional manner in front of a customer.  Stucco issued plaintiff a counseling memorandum on August 6, 2007, in which she also reminded plaintiff to leave at 4:30 p.m. and reprimanded her for being rude to CNY manager Manny Martinez.

h.      Personal Conflicts

Plaintiff argues that her superiors and coworkers at DOL were disrespectful and contentious towards her throughout her tenure at DOL.  In an email to the DOL department of employee relations and copied to Cheryl Kane and Kelli Owens, DOL supervisor Colleen McBride referred to plaintiff as "our problem child."  During her investigation of the State Fair incident, Kane sent an email indicating that she forced plaintiff's coworkers to give statements describing plaintiff's behavior even though they did not want to.  Plaintiff was not selected to receive "Career Development Facilitator" training she had applied for.  At deposition, plaintiff testified that the personal conflicts were so pervasive that she concluded "that my employer was trying to fire me or

get rid of me." Indeed, upon learning that plaintiff had resigned, DOL employee Suzanne Harrison emailed Russell Oliver stating, "Can we celebrate Debbie Morales?" Plaintiff's exhibits provide many additional examples of perceived and actual conflict between her and DOL staff.

2.    *CNY's Involvement with DOL and Plaintiff's Work Incidents*

Plaintiff alleges that "CNY's managers and personnel were actively engaged to support DOL managers in their discriminatory and retaliatory conduct as [plaintiff's] employer." Plaintiff characterizes CNY as the One Stop "operator," with whom DOL "worked as a partnership." Plaintiff alleges and offers testimony from CNY manager Manny Martinez to the effect that CNY and DOL managers established One Stop policies and processes "by consensus." Specifically, plaintiff alleges that the one stop "management team" consisted of both DOL and CNY employees: Kane, Youmans, Garrett and Owens from DOL, and Martinez and Sealey from CNY. Plaintiff also alleges that CNY staff "supervised the resource room to which [plaintiff] was assigned," and that staff meetings "included DOL and CNY staff" and were run by "CNY Works Managers Manny Martinez and Lenore Sealey." In support of her allegations, plaintiff offers deposition testimony from Cynthia Garrett, Manny Martinez, and emails from DOL employees.

CNY, on the other hand, argues that it did not have any employment authority over the plaintiff. CNY alleges that plaintiff "was an employee of the DOL" and that her "employment was governed by the terms and provisions of a collective bargaining agreement between the Public Employees Federation ('PEF') and the DOL." CNY asserts that plaintiff was not its employee and that it was not a party to plaintiff's and DOL's labor agreement. CNY quotes deposition testimony from plaintiff where she acknowledges as "common sense" that "CNY Works staff could not take any disciplinary action against" plaintiff, including issuing counseling memoranda, conducting

interrogations, and terminating plaintiff's employment.

Plaintiff alleges that the adverse actions taken against her were intermingled with her interaction with CNY staff and managers. Plaintiff asserts that when she complained to her supervisor that CNY employee Valencia stated that Spanish-speaking customers cannot be helped at One Stop, Martinez did nothing. Plaintiff offers testimony from her fourth interrogation indicating that Sealey commanded her to leave on one of the days she stayed later than 4:30, and that she forwarded some of plaintiff's evening emails to DOL managers to show that plaintiff continued to stay late. On April 26, 2007, CNY employee Lori Wilson also emailed DOL managers to inform them that plaintiff had stayed past 4:30. Plaintiff alleges further that CNY "repeatedly interfered in her affairs, communicating information to her supervisors in a manner" violative of Title VI.

On June 15, 2007, plaintiff attempted to put a Spanish language Selective Service pamphlet in the One Stop reception area. Plaintiff testified at deposition that in her experience, many of the LEP customers seeking One Stop services have not registered with Selective Service even though it is required for many of the resources and job opportunities One Stop provides. Plaintiff put the pamphlets in the reception area without asking her supervisors and without asking CNY staff first. Plaintiff alleges that a DOL employee asked CNY employee Lori Wilson to "investigate" whether the pamphlets could be placed in the reception area. Plaintiff offers an email chain between CNY and DOL supervisors about the incident indicating that there may have been yelling or some other form of a reprimand. In any case, the supervisors used the incident as another "nail[] in her coffin," and asked CNY staff to keep DOL updated on her behavior.

Even though she does not seek recovery on the basis of a hostile work environment, plaintiff

accused CNY of being "complicit" with DOL in the creation and maintenance of a hostile working environment, and that there "were extensive ongoing interactions with CNY Works staff" contributing to it.  When asked who at CNY subjected her to a hostile work environment, plaintiff named coworkers Andrea Schnobrich, Jane Helmer, Jeff Miller, Lori Wilson, and Alvaro Valencia, manager Manny Martinez, and director Lenore Sealy.  Plaintiff testified that Schnobrich filed a petty complaint against her "about something in the parking lot," and that Helmer had a "very condescending manner of interacting with" plaintiff in that she would say "shush" while plaintiff was working with a customer.  Plaintiff testified that Miller submitted a statement that supported "an investigation that resulted in an interrogation," and mentioned Wilson as being a key figure in the Selective Service pamphlet incident.  Plaintiff also testified that Sealy did not acknowledge her Spanish-language skills, and that Sealy and Martinez worked to move plaintiff out of CNY's facility, "or at least out of the resource room."  Plaintiff also offers an email from Sealy to Wilson in which she states "Never a dull moment" in reference to one of plaintiff's complaints.

D.     The Present Action

     Plaintiff alleges in her amended complaint that she "first contacted" the EEOC in January, 2006, but as yet has submitted no evidence in support of that contention.  Plaintiff attached exhibits to her motion to amend showing that she had participated a telephone interview with the EEOC on February 13, 2006, but that it had not received "any correspondence" from plaintiff at that time. The EEOC mailed a proposed formal discrimination charge on March 20, 2006, which instructed plaintiff to sign and notarize the draft before mailing it back.  Plaintiff filed a formal written charge with the EEOC on April 17, 2006.  The most recent discriminatory act plaintiff mentioned in her formal complaint occurred on May 26, 2005.  The EEOC declined to pursue plaintiff's charges of

discrimination and issued her a "Right to Sue" letter on April 24, 2006, which stated that her claims were untimely.

Plaintiff filed the instant action *pro se* against DOL and CNY on July 24, 2006, alleging both had intentionally discriminated against LEP customers and retaliated against her in violation of Title VII of the Civil Rights Act.  DOL moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(4), (5), and (6), arguing that plaintiff did not effectuate service properly, and that her claims were untimely and legally insufficient.  By order dated September 27, 2007, this Court granted DOL's motion in part, dismissing plaintiff's intentional discrimination claim on the basis that she lacked standing to assert an intentional discrimination claim on behalf of One Stop customers.

Plaintiff retained counsel and filed a motion to amend her complaint by dropping her Title VII intentional discrimination claim against CNY, asserting new Title VI  retaliation claims against both defendants, and asserting new facts related to the timeliness of her complaint.[5]  Plaintiff also recast her Title VII retaliation claim against DOL, alleging that it had discriminated against her because she associated with people of certain national origins.  Defendants opposed plaintiff's

---

[5] Plaintiff alleges in her amended complaint that "[b]y its actions, Defendant DOL created a discriminatorily hostile or abusive work environment based on Ms. Morales' association with persons whose countries of national origin included Mexico Cuba, Puerto Rico, Columbia, Dominican Republic, Honduras, and Ecuador."  In her response to its motion to dismiss, plaintiff further asserts that "CNY was complicit in the hostile actions and environment directed at her."

Despite these statements, the rest of plaintiff's amended complaint and responses are clear that she seeks recovery solely on the basis of the three counts listed in her complaint — intentional discrimination under Title VII against DOL, retaliation under Title VII against DOL, and retaliation under Title VI against DOL and CNY — not under a § 1981 or Title VII hostile work environment theory against either defendant.  Understandably, neither defendant addresses hostile work environment in their motions.  The Court therefore will not analyze any hostile work environment claim that may be looming in plaintiff's submissions, and expresses no opinion at this time as to whether plaintiff has abandoned it or whether she sufficiently stated it in the first place.

motion on the basis of undue delay, bad faith, and futility.  By memorandum decision and order

dated April 21, 2010, Magistrate Judge Andrew T. Baxter granted plaintiff's motion to amend.

Magistrate Judge Baxter found that the motion would not cause undue delay, was not the product of

bad faith, and that plaintiff had pleaded facts and provided exhibits sufficient to establish the

timeliness and legal sufficiency of her amended complaint.

CNY moved for summary judgment on June 22, 2011, seeking dismissal the single claim

against it.  DOL moved separately for partial summary judgment on June 27, 2011, seeking

dismissal of all plaintiff's claims except the Title VII retaliation claim insofar as it relates to facts

following plaintiff's filing of the instant action on June 24, 2006.

**III.    DISCUSSION**

A.    Standard of Review

Summary judgment is appropriate when there is no genuine issue of material fact and the

moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  "A fact is

'material' for these purposes when it 'might affect the outcome of the suit under the governing

law."  *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011) (quoting

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Irrelevant or unnecessary facts do not

preclude summary judgment, even when they are in dispute.  *See Anderson*, 477 U.S. at 248.  The

moving party bears the initial burden of establishing that there is no genuine issue of material fact

to be decided.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  With respect to any issue

on which the moving party does not bear the burden of proof, it may meet its burden by showing

that there is an absence of evidence to support the nonmoving party's case.  *See id.* at 325.  Once

the movant meets this initial burden, the nonmoving party must demonstrate that there is a genuine

unresolved issue for trial.  *See* Fed. R. Civ. P. 56(c), (e).

Although the trial court must resolve all ambiguities and draw all inferences in favor of that party against whom summary judgment is sought, *see Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989); *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir. 1985), the motion will not be defeated by a non-movant who raises merely "metaphysical doubt" concerning the facts or who only offers conjecture or surmise.  *See Delaware & H. R. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  Nevertheless, "[i]t is not the province of the court itself to decide what inferences should be drawn . . .; if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgement is improper."  *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010) (quoting *Howley v. Town of Stratford*, 217 F.3d 141, 151 (2d Cir. 2000)) (internal quotation marks omitted).

B.     Statute of Limitations

As a preliminary matter, DOL appears to have abandoned its statute of limitations objections to plaintiff's Title VII claims.  It instead argues for dismissal of plaintiff's Title VII intentional discrimination claim and part of plaintiff's Title VII retaliation claim on substantive grounds.  Plaintiff likewise did not respond with any new evidence to bolster her previous contentions of timeliness.  Therefore, to determine which discrete acts of alleged intentional discrimination are timely, the uncontroverted facts in the record will be taken as true for purposes of the instant motion, and all reasonable inferences will be drawn therefrom in favor of the nonmoving party.  *See* N.D.N.Y. L.R. 7.1(a)(3).

"[W]hen a plaintiff fails to file a timely charge with the EEOC, the claim is time barred."

*Butts v. City of New York Dep't of Hous. Pres. & Devel.*, 990 F.2d 1397, 1401 (2d Cir. 1993),

*superseded on by statute on other grounds as stated in Hawkins v. 1115 Legal Serv. Care*, 163 F.3d

684 (2d Cir. 1998).  "An employment discrimination claim must be filed with the EEOC within 300

days of the alleged discrimination in a state, like New York, with a fair employment agency."

*Pikulin v. City Univ. of New York*, 176 F.3d 598, 599 (2d Cir. 1999).  Title VII requires that a claim

be filed with it in the form of a "charge."  *See* 42 U.S.C. 2000e-5;  *Holowecki v. Fed. Express Corp.*,

440 F.3d 558, 566–67 (2d Cir. 2006).  A "charge" must be a writing that gives "notice to the EEOC

. . . of a kind that would convince a reasonable person that the grievant has manifested an intent to

activate the Act's machinery."  *Holowecki*, 440 F.3d at 567 (quoting *Bihler v. Singer Co.*, 710 F.2d

96, 99 (3d Cir. 1983)) (describing EEOC "charge" in context of an ADEA claim).  The last discrete

discriminatory act plaintiff described in her formal EEOC charge occurred on May 26, 2005.  For

plaintiff's claim to be timely, her "charge" must therefore have been submitted to the EEOC by

March 21, 2006.  Plaintiff filed her formal charge on April 17, 2006.

     In an order dated April 20, 2010, Magistrate Judge Andrew T. Baxter granted plaintiff's

motion to amend based, in part, of a finding that plaintiff's proposed amended complaint was not

futile as to the statute of limitations issue for two reasons: (1) "the continuing uncertainty about

whether [plaintiff] filed the necessary written submission with the EEOC by March 21, 2006"

precluded judgment that it was untimely as a matter of law, and (2) plaintiff's proposed amended

complaint alleged "numerous incident of discrimination and/or retaliation" related to her untimely

claims within three hundred days of the date she filed her formal charge.

     Based on the record available at this time, this Court cannot say as a matter of law that

plaintiff would be unable to demonstrate timeliness at trial.  Attached to her motion to amend is a

24

document from the EEOC dated March 20 that states: "Attached are five copies of a Charge of Discrimination which I drafted from the information you provided to our office.  Please: 1. review the charge forms and make any corrections. 2. Sign the charge forms in front of a **Notary Public** in the blocks where I have highlighted. 3. Return the signed charge forms to this office in the enclosed postage-paid envelope." (emphasis in original) Taking this uncontroverted evidence in the light most favorable to the plaintiff, a jury could find that the EEOC had plaintiff's written charge before March 21, 2006, and that its only defect was that it was not yet signed and notarized.  *See Edelman v. Lynchburg Coll.*, 535 U.S. 106, 116–17 (2002) ("Where a statute or supplemental rule requires an oath, courts have shown a high degree of consistency in accepting later verification as reaching back to an earlier, unverified filing . . . [and] Congress [is] presumed to have known of this settled judicial treatment of oath requirements when it enacted and later amended Title VII.").  Further, a jury could find that because the EEOC had the written charge before March 21, it did give sufficient notice to the EEOC that plaintiff intended to "activate the Act's machinery" as required under Title VII.  *See Holowecki*, 440 F.3d at 567.  Therefore, for purposes of the instant motion, all alleged discrete discriminatory acts under Title VII occurring on or after May 26, 2005 will be treated as timely.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 112 (2002) ("[D]iscrete acts that fall within the statutory time period do not make timely acts that fall outside the time period.").

C.      Intentional Discrimination Claim Against DOL

Discrimination claims brought pursuant to Title VII are reviewed using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  "In a nutshell, a plaintiff first bears the 'minimal' burden of setting out a *prima facie* discrimination case

. . . .” *McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 215 (2d Cir. 2006).  To set out a *prima facie* case, “a plaintiff must show that (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination.” *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491–92 (2d Cir. 2010).  Upon a *prima facie* showing of discrimination, the plaintiff “is then aided by a presumption of discrimination unless the defendant proffers a ‘legitimate, nondiscriminatory reason’ for the adverse employment action.” *McPherson*, 457 F.3d at 215.  If there is a legitimate, nondiscriminatory impetus behind the adverse employment action, “the presumption evaporates and the plaintiff must prove that the employer's proffered reason was a *pretext* for discrimination.” *Id.* (emphasis added).  For purposes of the instant motions, neither defendants dispute that plaintiff was qualified to hold the position she had.

1.     Prima Facie *Showing of Discrimination*

Plaintiff “asserts that DOL discriminated against her and retaliated against her based on her association with and advocacy for persons whose national origins included Mexico, Cuba, Puerto Rico, Columbia, Dominican Republic, Honduras, and Ecuador.”  DOL argues that plaintiff has not made a *prima facie* showing of intentional discrimination for two reasons: (1) plaintiff's claim alleges discrimination based on language, and language does not delineate protected groups, and (2) plaintiff's claim to relief for association with persons of a particular national origin has no basis in the law.  Plaintiff does not dispute the first point, arguing instead that her claim is based entirely on association with persons of a Spanish-speaking national origin.  Plaintiff also argues that the Second Circuit extends Title VII protection to association with persons of a particular national origin.

a.       Plaintiff's Association With a Protected Class

Embracing several earlier District Court opinions regarding Title VII's breadth, *e.g.*,
*Whitney v. Greater N.Y. Corp. of Seventh-Day Adventists*, 401 F. Supp. 1363 (S.D.N.Y. 1975), the
Second Circuit in *Holcomb v. Iona College*, 521 F.3d 130 (2d Cir. 2008), held that "an employer
may violate Title VII if it takes action against an employee because of the employee's association
with a person of another race."  *Id.* at 138.  In *Holcomb*, a Caucasian plaintiff brought suit against
his former employer, Iona College, arguing that it terminated his employment because of his
marriage to an African American woman.  *Id.* at 131–32.  Although Title VII "prohibits
discriminatory action against an individual 'because of *such individual's race*,' " the Circuit held
that plaintiff's assertion was sufficient for a *prima facie* showing of race discrimination.  *Id.* at 139
(quoting 42 U.S.C. § 2000e-2(a) (emphasis in *Holcomb*)).  "The reason is simple: where an
employee is subjected to adverse action because an employer disapproves of interracial association,
the employee suffers discrimination because of the employee's *own* race."  *Id.*  Since *Holcomb*,
courts in this Circuit have held that several interracial associations besides marriage can establish a
*prima facie* case for intentional discrimination, including adoption, *LaGrassa v. Autoone Ins. Co.*,
Civ. No. 07-1072, 2008 WL 3887606 at *6 (E.D.N.Y. Aug. 20, 2008), and non-marital romantic
involvement. *Parker v. AECOM USA, Inc.*, 3:09-cv-1078 (WWE), 2010 WL 625417 at *1–2 (D.
Conn. 2010).

DOL makes two arguments in opposition to the first prong of plaintiff's *prima facie* case.
First, DOL argues that plaintiff is not associated with any protected class because plaintiff's
workplace complaints involved language disparity, not national origin.  In support of this argument,
DOL relies on *Soberal-Perez v. Heckler*, 717 F.2d 36 (2d Cir. 1983), which held that although

27

"Hispanics as an *ethnic group* do constitute a suspect class[,] . . . [l]anguage, by itself, does not identify members of a suspect class." *Id.* at 41.  Plaintiff alleges that she is associated with protected classes, specifically those of Spanish-speaking Caribbean, Central American, and South American countries predominant in the Syracuse area.

Though DOL's argument exposes a weakness at the core of plaintiff's association claim,[6]

---

[6] DOL's argument springs from plaintiff's unexplained failure to distinguish between the seven discrete national origins she names in her amended complaint.  "The term 'national origin' on its face refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came." *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88 (1973); *see* 29 C.F.R. § 1606.1 (defining national origin discrimination as "[T]he denial of equal employment opportunity because of an individuals' or his ancestor's, place of origin; or because an individual has the physical, cultural, or linguistic characteristics of a national origin group").  Plaintiff lumps together persons of Mexican, Cuban, Puerto Rican, Columbian, Dominican, Honduran, and Ecuadorian descent into the catch-all phrases " 'LEP Spanish speaking' customers" and "MCPR Customers" in her amended complaint and responses, respectively, rather than detailing the kind of impact DOL's policies had on each individual nationality.  As she puts it, plaintiff "was clear in her Complaint and throughout her deposition testimony that her association was not with persons with *every* national origin where the Spanish language is spoken but rather with the particular national origins *predominant in the Syracuse area*," as if those predominant in the Syracuse area are themselves indistinguishable.  Plaintiff's failure is striking in light of the rich cultural and historical variance between each of the Caribbean, Central American, and South American nations she names — it is not obvious from plaintiff's submissions, for example, how "national origin" discrimination against Columbian citizens can be equated with that against Puerto Rican citizens.  *See* 8 U.S.C. § 1402 (extending United States citizenship to all persons born in Puerto Rico).  As such, DOL is correct in observing that plaintiff's claim rests upon those aspects of cultural identity common among the seven national origins plaintiff names, and that Spanish language is among the most obvious connections.

Nevertheless, DOL's observation is not fatal to plaintiff's association claim.  Plaintiff's language throughout her response, declarations, and record evidence draws from *both* race and national origin lexicons.  For example, plaintiff concludes in her response to DOL's motion that "[i]t was, therefore, known in the office that although [plaintiff] was not *Hispanic*, she was associated with people from Mexico, Puerto Rico, etc."  Plaintiff chooses to quote record evidence in her response to the same effect: "In February 2006 in a series of e-mails [plaintiff] Ms. Morales wrote to Betty Youmans that 'I have a vested interest in the resolution of these concerns, not only due to my association with persons of various national origins where Spanish is the native language spoken, or the fact that my 4 children are of bi-*racial*/bi-national descent, but also overwhelmingly due to the very fabric of who I am[.]' "  Plaintiff uses this language without clarifying how her or her

(continued...)

28

it does not undermine plaintiff's showing of association with a protected class.  Language "by itself" may not identify members of a suspect class, *id.*, but a jury could find that plaintiff's "advocacy" for Hispanic customers did extend beyond language by virtue of the content of her workplace complaints, her private advocacy and interests, and her family membership.  *See Perez v. New York & Presbyterian Hosp.*, No. 05-Civ.-5749 (LBS), 2009 WL 3634038 at *9 (S.D.N.Y. Nov. 3, 2009) ("The EEOC defines national origin discrimination 'broadly' to include discrimination based on the 'linguistic characteristics of a national origin group.' " (quoting *Deravin v. Kerik*, 335 F.3d 195, 201 (2d Cir. 2001))).  Several of plaintiff's workplace complaints mention her concern about One Stop's treatment of customers of Hispanic racial or national descent. (*See, e.g.*, Plf.'s Resp. Exs. 29, 38, 68, 73, 81) In her response, plaintiff cites deposition testimony in which DOL manager Betty Youmans recognizes that plaintiff sought to raise staff awareness of the "cultural background" of the groups comprising the majority of One Stop's LEP customer base.  At her

---

[6](...continued)
children's *race* is relevant to the national origin of customers against whom DOL allegedly discriminated.

The implication of plaintiff's failure to distinguish the wide range of national origins she lists throughout her response materials is clear:  Plaintiff **is conflating the concepts of race and national origin**. Plaintiff is by no means the first litigant to confuse national origin discrimination with race discrimination. *See, e.g.*, *Devarin v. Kerik*, 335 F.3d 195, 201 (2d Cir. 2003); *Tarshis v. Riese Org.*, 211 F.3d 30, 39 (2d Cir. 2000), *abrogated on other grounds by Swierkiewicz v. Sorema*, 534 U.S. 506 (2002); *Lopez v. Flight Servs. & Sys. Inc.*, 07-cv-6186 (CJS), 2008 WL 203028 at *6–7 (W.D.N.Y. Jan. 23, 2008), *overruling on other grounds recognized in Barrus v. Dick's Sporting Goods, Inc.*, 732 F. Supp. 2d 243 (W.D.N.Y. 2010). So strong is the interrelation of race and national origin, in fact, that the failure to plead one does not always foreclose consideration of the other, *see Alonzo v. Chase Manhattan Bank, N.A.*, 25 F. Supp. 2d 455, 459 (S.D.N.Y. 1998) (allowing plaintiff to assert national origin and race discrimination claims even though he had only asserted national origin discrimination in his EEOC charge).  National origin discrimination claims are often identical to corresponding race discrimination claims.  *Devarin*, 335 F.3d at 201 (recognizing that "race and national origin discrimination claims may substantially overlap or even be indistinguishable depending on the specific facts of a case").  Consequently, this Court will consider plaintiff's claim as one based on race *and* national origin for purposes of the present motion.  *Cf. id.* at 201–03 & n.5 (finding dismissal of race discrimination claim on failure to exhaust grounds inappropriate where plaintiff's language implies both race and national origin discrimination, and where plaintiff relied on an EEOC counselor to draft the complaint form).

interrogations for the hospital incident and the scope of employment incident, plaintiff stated that she was interested in the technical aspects of immigration law and that she conducted internet research on issues related to Hispanic racial and national origin issues while at work. *See Johnson*, 215 F.3d at 575.  Outside of the workplace, plaintiff was a member/volunteer of the EFWA, a group dedicated to servicing certain segments of the Hispanic community in the Syracuse area.  Plaintiff also describes her children as "bi-racial/bi-national." *See Holcomb*, 521 F.3d at 139; *LaGrassa*, 2008 WL 3887606 at *6.  Because a reasonable jury could find that her advocacy relies upon racial, cultural, social, and political characteristics of protected groups in addition to language, plaintiff's evidence raises an issue of material fact as to whether her association connects her to either a protected racial group or a protected set of Caribbean, Central American, and South American national origins.

Second, DOL argues that plaintiff cannot establish that she is associated with any protected group based on the Second Circuit's opinion in *Holcomb*.  DOL asserts that, because "anyone of any race or national origin could engage in advocacy on behalf of Spanish-speaking customers," plaintiff's advocacy did not implicate her own American Caucasian background like the plaintiff in *Holcomb*.  DOL's argument boils down to the question of whether advocacy can serve as an adequate basis for an association claim, since any person of any race, origin, or creed could advocate on behalf of any other person.

Although most cases in other federal jurisdictions to address the issue have focused on interracial familial or romantic associations, *Holcomb*, 521 F.3d at 139 (citing Fifth, Sixth and Eleventh Circuit cases), at least one District Court in this Circuit has recognized Title VII's application to discrimination based on a non-romantic "casual social relationship" between persons

of different races, *Whitney*, 401 F. Supp. at 1365–66 & n.3, and the Second Circuit relied upon it to support its reasoning in *Holcomb*. *See Holcomb*, 521 F.3d 130, 139 (citing *Whitney*, 401 F. Supp. at 1366).  Furthermore, the Sixth Circuit has held that advocacy on behalf of a protected group alone is sufficient to formulate a Title VII claim based on association.  *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 575 (6th Cir. 2000); *see Bartlett v. Whirlpool Corp.*, 556 F.3d 502, 511–14 (6th Cir. 2009).  Plaintiff asserts in her response that she "is of non-Hispanic European descent," and presents substantial evidence that she advocated for persons of Hispanic racial or national identities.  Therefore, plaintiff's evidence of her advocacy is sufficient to establish her association with a protected race or national origin for purposes of her *prima facie* case.  *See Holcomb*, 521 F.3d 130, 139 (citing *Whitney*, 401 F. Supp. at 1366); *Bartlett*, 556 F.3d at 511–14; *Johnson*, 215 F.3d at 575.

b.    DOL's Adverse Employment Actions

DOL argues that plaintiff's personal conflicts and the issuing of counseling memoranda do not constitute adverse employment actions under Title VII.  Plaintiff insists that her conflicts with DOL staff, counseling memoranda, interrogations, disciplinary hearings and judgments, and her "constructive termination" are individually adverse employment actions.

"An adverse employment action is 'a materially adverse change in the terms and conditions of employment.' " *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (quoting *Sanders v. New York City Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004)) (internal modification omitted).  "To be materially adverse, a change in working conditions must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.' " *Sanders*, 361 F.3d at 755 (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)).  Examples include "a demotion evidenced by

31

a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Mathirampuzha*, 548 F.3d at 78 (quoting *Sanders*, 361 F.3d at 755).

"District courts within the Second Circuit have often found . . . 'that reprimands, threats of disciplinary action, and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation." *Abraham v. Potter*, 494 F. Supp. 2d 141, 147–48 (D. Conn. 2007) (quoting *Honey v. Cnty. of Rockland*, 200 F. Supp. 2d 311, 320 (S.D.N.Y. 2002)).  Consequently, the issuance of a "counseling memorandum" and a "notice of discipline," without any further evidence regarding a materially adverse effect thereof, is not an adverse employment action as a matter of law.  *Weeks v. New York State (Div. of Parole)*, 273 F.3d 76, 86 (2d Cir. 2001), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 108–14 (2002); *see Sanders*, 361 F.3d at 756 (citing *Weeks*, 273 F.3d at 86) (negative performance evaluation, on its own, insufficient to constitute adverse employment action as a matter of law).  Furthermore, interrogations alone are insufficient as a matter of law to establish an adverse employment action.  *Shanahan v. New York*, 10-Civ.-0742, 2011 WL 223202 at *10 (S.D.N.Y. Jan. 24, 2011) (citing *Eugenio v. Walder*, 06-Civ.-4928, 2009 WL 1904526 at *10–11 (S.D.N.Y. July 2, 2009)).

Plaintiff offers deposition testimony and copies of disciplinary material in support of her contention that DOL undertook several adverse employment actions against her.  Although plaintiff characterizes the numerous counseling memoranda and the formal reprimand as "punitive," she does not allege and her evidence does not show that any caused a decrease in her salary, a change in her title, a loss in her benefits, or any other change in her employment status.  *See Sanders*, 361

F.3d at 756; *Weeks*, 273 F.3d at 86.  Plaintiff also does not put forth evidence that could support a finding that any interrogation by itself had a detrimental impact on her employment, other than those resulting in a later materially adverse action.  *See Shanahan*, 2011 WL 223202 at *10. Consequently, the only discrete adverse employment actions taken within the statute of limitations period that may satisfy the second *McDonnell Douglas* prong are: (1) the one-week suspension without pay arising out of plaintiff's failure to cooperate with the investigation of the hospital advocacy incident; and (2) plaintiff's alleged "constructive discharge" following the notice of termination arising out of the 2006 scope of employment, insubordination, and tardiness incidents.[7] There is no question that plaintiff's one-week suspension without pay qualifies as an adverse employment action.  *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223–34 (2d Cir. 2001).

"Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily."  *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir. 1996).  "[W]orking conditions are intolerable when, viewed as a whole, they are 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.' " *Terry v. Ashcroft*, 336 F.3d 128, 152 (quoting *Chertkova*, 92 F.3d at 89).[8]

---

[7] An arbitrator reduced plaintiff's punishment for the Anna Johnson incident from a suspension to an official reprimand.  As such, the notice of discipline issued on March 26, 2005 purporting to suspend plaintiff for that incident is not an adverse employment action.

[8] Although plaintiff uses the phrase "constructive discharge" liberally throughout her response papers, at no time in this action has she claimed relief for "constructive discharge" under 42 U.S.C. § 1981.  *See Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 719 (2d Cir. 2010) (treating Title VII causes of action separately from constructive discharge under § 1981).  As she does not assert an independent cause of action for constructive discharge, this Court will consider the facts relating to the end of her employment

(continued...)

For purposes of the *McDonnell Douglas* analysis, plaintiff has raised an issue of material fact as to whether she was constructively discharged.  DOL issued a notice of discipline on November 11, 2006, that stated plaintiff was to be discharged.  Included with that notice was a resignation form, something a reasonable jury could conclude was part of an effort to compel plaintiff to resign before her termination or any potential challenge to it were processed.  Plaintiff filed a timely grievance, and as detailed in the grievance memorandum she includes as an exhibit to her responses, but was unable to alter the punishment.  Plaintiff requested arbitration, and worked with her union to negotiate a resignation agreement with DOL.  Plaintiff testified at deposition that "it had been unbearable . . . to be in the office" in the time leading up to her resignation, and that she took two medical leaves of absence between receiving the notice of discipline and resigning to recover from work-related stress.  Plaintiff argues that she "saw no other way to escape the endless series of disciplinary actions and harassment other than to resign from her employment," and she offers substantial evidence demonstrating that she received more counseling memoranda and informal reprimands, and that she often came into conflict with her superiors after November 11, 2006.  Therefore, plaintiff has offered evidence sufficient for a jury to find that her resignation was a constructive discharge, and as such, an adverse employment action.

c.    Causation

"It is well-settled that an inference of discriminatory intent may be derived from a variety of circumstances including but not limited to: . . . 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the

---

[8](...continued)

as a potential "adverse employment action" instead. *See Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188–89 (2d Cir. 1987) ("In evaluating employment discrimination claims, we apply the concept of constructive discharge.").

employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.' " *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009 ) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)).  Nevertheless, "a plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) (quoting *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001)).  Taking the facts in the light most favorable to plaintiff, the timing of conflicts involving her "advocacy" for LEP customers gives rise to a presumption of causation for both discrete adverse employment actions.

2.    *DOL's Legitimate, Non-Discriminatory Justification*

Plaintiff received a four-week suspension on January 13, 2006, after an interrogation where she, with a union representative at her side, admitted that she disobeyed a command to attend a previously-scheduled interrogation.  Plaintiff challenged the punishment and went to arbitration, where she was represented by counsel and had the opportunity to present evidence in her defense. Even though the arbitrator reduced plaintiff's punishment, he found that plaintiff was "guilty of misconduct for failing to appear for the scheduled interrogation on December 7, 2006," and that plaintiff's "explanation" for missing it was "both inconsistent and implausible."  Nowhere in her current filings does plaintiff deny that she failed to attend the initial interrogation as directed. Therefore, based on plaintiff's misconduct, as confirmed by an independent arbitrator after a hearing where plaintiff was represented by counsel and had an opportunity to present evidence in her defense, DOL had a legitimate, non-discriminatory reason for imposing the one-week

suspension on plaintiff in April, 2007.

According to the Second Circuit, "misconduct may certainly provide a legitimate and non-discriminatory reason to terminate an employee" *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010) (quoting *Owens v. New York City Hous. Auth.*, 934 F.2d 405, 409 (2d Cir. 1991)).  At the March 3, 2006, interrogation leading to the notice of termination, plaintiff was asked about her persistent insubordination, unprofessional behavior, and misuse of DOL time and resources for non-work purposes unrelated to her advocacy for Hispanic communities.  As plaintiff admits, she received many counseling memoranda and notices of discipline before that point, often for unprofessional behavior and resistence to commands from superiors.  The record is replete with additional examples of DOL managers observing plaintiff engaging in misconduct.  Consequently, DOL also had a legitimate, non-discriminatory reason for constructively terminating plaintiff's employment.

3.      *Pretext*

When a defendant offers a legitimate, non-discriminatory justification for taking an adverse employment, "the presumption of discrimination arising with the establishment of the *prima facie* case drops from the picture."  *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (citing *St. Mary's Honor Ctr v. Hicks*, 509 U.S. 502, 510–11 (1993)).  "In such situations, plaintiff carries the ultimate burden of persuasion and must produce evidence such that a rational finder of fact could conclude that the adverse action taken against her was more likely than not a product of discriminatory animus."  *Leibowitz v. Cornell Univ.* 584 F.3d 487, 504 (2d Cir. 2009).  Although plaintiff's response to DOL's motion does not address the issue of pretext, the Court "may still consider evidence establishing plaintiff's *prima facie* case 'and the inferences properly drawn

therefrom . . . on the issue of whether the defendant's explanation is pretextual.' " *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 n.10 (1981)).

"[A] plaintiff does not necessarily satisfy the ultimate burden of showing intentional discrimination by showing pretext alone." *Fisher v. Vassar College*, 114 F.3d 1332, 1339 (2d Cir. 1997), *abrogated by Reeves*, 530 U.S. 133.  Indeed, a proffered "reason cannot be proved to be a 'pretext *for discrimination*' unless it is shown *both* that the reason was false, *and that* discrimination was the real reason." *Id.* (quoting *St. Mary's Honor Cntr*, 509 U.S. at 515) (emphasis in *Fisher*).  "The burden of establishing pretext is a higher burden than that required to establish the *prima facie* case, because at this stage . . . plaintiff's 'initially vague allegation of discrimination' must be 'increasingly sharpened and focused.' " *Edwards v. City of New York*, 03-Civ.-9407 (PAC), 2005 WL 3466009 at *16 (S.D.N.Y. Dec. 19, 2005) (quoting *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir. 1985)).

Plaintiff does not address whether the one week-suspension was imposed as a pretext, but she does argue that "[t]he event that most clearly demonstrates that DOL's adverse actions against Ms. Morales were motivated by discriminatory animus was the investigation and interrogation regarding Ms. Morales's association with the FEWA."  Owens questioned plaintiff regarding the EFWA at length, asking specifically "are you affiliated" and "[were you] wearing a badge that indicated you were affiliated." Plaintiff asserts that "based on this testimony, a reasonable jury could conclude that the mere 'affiliation' with the EFWA, whose members include persons from Mexico, Cuba, Puerto Rico, etc., was cause for the unjustified report by Kelli Owens and that it was discriminatory."

Even if she directed her argument towards the pretext issue in her response, plaintiff's evidence would be insufficient to meet her burden to establish that DOL's proffered reason for the one-week suspension was pretext for discrimination.  Defendant argues that the arbitrator's imposition of the one-week suspension "weigh[s] heavily against the contention that the discipline was retaliatory or discriminatory."  Indeed, the Second Circuit has recognized that when an arbitration decision "follows an evidentiary hearing and is based on substantial evidence, the Title VII plaintiff, to survive a motion for summary judgment, must present *strong* evidence that the decision was *wrong as a matter of fact*."  *Collins v. New York City Transit Auth.*, 305 F.3d 113, 119 (2d Cir. 2002).  In other words, a plaintiff challenging a punishment set at arbitration must proffer "new evidence not before the tribunal" or evidence sufficient to establish "that the impartiality of the proceeding was somehow compromised."  *Id.*  Plaintiff does not challenge the neutrality of the arbitrator, and concedes in her submissions the key fact underlying the arbitrator's decision, namely, that she was not present at the December 7 interrogation DOL ordered her to attend.  The arbitration decision, which plaintiff attaches as an exhibit to her responses, does not imply in any way that it considered plaintiff's affiliation with the EFWA or her other advocacy activity in coming to its conclusion.  As she offers no evidence whatsoever challenging the factual basis or impartiality of the arbitration decision imposing her one-week suspension, let alone *strong* evidence of error or bias, plaintiff cannot meet her burden to rebut DOL's reason for imposing the penalty. *See id.*  Consequently, her intentional discrimination claim on the one-week suspension must fail.

As with that relating to her suspension, plaintiff's record evidence concerning the incidents leading to her constructive termination is insufficient to meet her burden, given DOL's legitimate, non-discriminatory reasons for initiating the termination process.  Plaintiff's evidence shows that

she was interacting with Wilfredo and Catherine, Hispanic LEP customers, and that DOL felt she went beyond the scope of her employment in helping them when she contacted third parties on their behalf.  Plaintiff stated at deposition that DOL's accusations were false, but she offers no evidence that DOL disapproved of her actions *because of* Wilfredo and Catherine's race or national heritage. Plaintiff can show that DOL questioned her about her use of her work email account to contact a former DOL employee and several third parties, but she fails to show how her termination could have been premised upon the race or national origin of her contacts rather than the fact that the emails were not work-related.  *See Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1040 (2d Cir. 1993).  In fact, most of the uncontroverted incidents DOL presented at plaintiff's March interrogation, such as her constant refusal to leave the office at 4:30 p.m. despite frequent instructions to do so, and her unprofessional behavior, were completely unrelated to her interactions with Hispanic customers in the first place.  Therefore, plaintiff's intentional discrimination claim based on her constructive discharge must also fail.

Plaintiff offers a printout of OSOS computer entries under seal showing that One Stop employees across New York State recorded have recorded national origin information for some customers, specifically those of customers from Mexico, Cuba, Puerto Rico, Columbia, Dominican Republic, Ecuador, and Honduras.  Plaintiff argues that "a reasonable jury could conclude that the national origin of the MCPR Customers *was* available and was a factor in the access to services provided to them," and that "the use of the data was a source of mischief and discrimination against the MCPR Customers."  Plaintiff further argues that the printout contradicts "the testimony of DOL and CNY personnel who claimed not to know the national origins of the customers in the community they served" and that "[a] jury should weigh whether this disputed fact — this feigned

lack of knowledge in the face of such data — is indicative of discriminatory animus."

The printout in its entirety, however, provides no basis for a factfinder to conclude that DOL harbored any inappropriate animus.  The printout does not specify which of the customers listed came to the Syracuse One Stop office, and many of the entries detail services customers received from other offices across the state, some as far away as Long Island.  Plaintiff does not allege or show that *other* national origins were not also listed or were listed differently.  The printout contains no disparaging, hostile, or racist comments whatsoever.  In fact, the vast majority of national origin entries appear incident to a description of the customer's educational background and employment history — biographical information necessary for One Stop employees to connect the customer to appropriate employment opportunities.  Moreover, plaintiff's contention that this printout "contradicts" the testimony of DOL and CNY personnel and therefore is evidence of their discriminatory bias is purely speculative and conclusory.    Plaintiff offers no evidence of improper animus that could support a rational finding that she was constructively terminated because of the *race or national origin* of those with whom she associated.  For example, plaintiff does not offer evidence that other employees who did not associate with Hispanic communities were not punished for habitual lateness and insubordination.  Plaintiff does not offer evidence suggesting that termination or suspension were excessive as compared to other DOL employees, especially in light of the fact that she had been issued numerous counseling memoranda and notices of discipline earlier in her tenure for conduct unrelated to her association.  Plaintiff offers no evidence that anybody ever considered the race or national origin of her children or husband in their dealings with her.  No email plaintiff offers as evidence suggests any sort of disapproval over those she associated with.  In fact, plaintiff's undisputed evidence shows that *other* non-Hispanic DOL

employees interacted with Hispanic or LEP customers, and that they were not mistreated for having those associations.

To defeat summary judgment on the basis of pretext, plaintiff may not rely solely upon her own self-serving and conclusory statements that DOL terminated her because of an inappropriate animus. *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (1996).  As she does not rebut defendant's legitimate, nondiscriminatory reasons for terminating her, and because her evidence provides no direct or indirect basis of finding that she was terminated because of the nationality or race of those person with whom she associated, plaintiff's intentional discrimination claim regarding her constructive discharge must fail.

D.     Title VII Retaliation Claim Against DOL

DOL concedes that plaintiff's allegations regarding retaliatory "adverse employment actions that were taken against her in the period that followed the filing of her *pro se* complaint on July 24, 2006 . . . present[] issues of fact that would have to be resolved by trial."  DOL seeks dismissal of plaintiff's Title VII retaliation claims against it insofar as those claims are related to actions taken before July 24, 2006.[9]  DOL argues that "there is no evidence that Plaintiff made any formal or informal claim that she was the victim of employment discrimination[] at any point in time before July, 24, 2006," and that whatever complaints plaintiff did make in the preceding period are "insufficient as a mater of law to predicate a viable retaliation claim under Title VII."  In her response, plaintiff contends that she made several protected actions before July 24, including one as

---

[9] Plaintiff's response appears to argue that DOL's admission to certain outstanding issues of fact warrants denial of the entire motion.  This argument is not persuasive, however, because DOL's motion and reply state explicitly that its concessions are limited to the allegedly retaliatory acts committed after July 24, 2006, the date plaintiff filed her original complaint.

early as February 13, 2006.

"Title VII makes it unlawful for an employer to discriminate against an employee 'because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.' " *Terry v. Ashcroft*, 336 F.3d 128, 140 (2d Cir. 2003). "The *McDonnell Douglas* burden shifting analysis used in claims of discrimination in violation of Title VII also applies to retaliation claims brought pursuant to Title VII." *Id.* at 141 (citing *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996)). "To establish a *prima facie* case of such retaliation, the plaintiff must show: (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. *McMenemy v. City of Rochester*, 241 F.3d 279, 282–83 (2d Cir. 2001) (citing *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 113 (2d Cir. 2000)).

In her response, plaintiff asserts that she took two protected actions before July 24, 2006. First, plaintiff asserts that she called the EEOC on February 13, 2006, and discussed filing a formal discrimination charge. Although contacting the EEOC in relation to filing a discrimination charge may be "protected activity," there is no evidence in the record to suggest that DOL was aware that plaintiff had communicated with the EEOC. As such, plaintiff's evidence is not sufficient to support the contention that she was retaliated against for protected activity she took on February 13, 2006.

Second, plaintiff contends that an email she wrote to DOL Division of Employee Services director Karen Papandrea on February 16, 2006, was a protected action under Title VII for which she was retaliated against. "[I]nformal complaints to supervisors constitute protected activity under

Title VII." *Scalafani v. PC Richard & Son*, 668 F. Supp. 2d 423, 437 (E.D.N.Y. 2009); *see Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000). Furthermore, "[t]he plain language of Title VII . . . prohibits discrimination by an employer against an employee who 'has opposed *any* practice made an unlawful employment practice' by Title VII.' " *McMenemy*, 241 F.3d at 283 (2d Cir. 2001) (quoting 42 U.S.C. 2000e-3(a)). Consequently, to satisfy the 'protected activity' element of a Title VII retaliation claim, "[t]he plaintiff is only required to have had a good faith, reasonable belief that he was opposing an employment practice made unlawful by Title VII." *McMenemy*, 241 F.3d at 285 (citing *Wimmer v. Suffolk Cnty. Police Dep't*, 176 F.3d 125, 134 (2d Cir. 1999)).

Defendant argues generally that plaintiff's complaints to her supervisors cannot serve as a predicate for a Title VII retaliation claim because she was complaining about actions taken against third parties. *See generally Wimmer*, 176 F.3d 125 (granting judgment as a matter of law on Title VII retaliation claim against plaintiff who complained about co-workers' allegedly discriminatory conduct against third parties). *But see La Grande v. DeCrescente Distrib. Co.*, 370 Fed. App'x 206, 212 (2d Cir. 2010) (citing *Manigaulte v. C.W. Post of Long Island Univ.*, 659 F. Supp. 2d 367, 374–75 (E.D.N.Y. 2009)). To the contrary, a reasonable jury could find that plaintiff's February 16 email to Papandrea constitutes an informal complaint about employment actions taken against her, not third parties. In the email, plaintiff states that "[b]ecause I have raised my voice and spoken out in defense of those groups who are historically disadvantaged, I have been and continue to be subjected to disciplinary proceedings, retaliation, and harrassment [sic]. In pursuing my right to bring this to the awareness of authorities, the retaliation and harrassment [sic] . . . continues." Plaintiff further writes that her "enthusiasm, passion, creativity, zeal are qualities which have not

been rewarded . . . [and] rather are qualities which are scorned."  Plaintiff also writes that she refrained from raising her concerns "for some time" because of a "[f]ear of reprisal."  A reasonable jury could find that plaintiff's email was an informal complaint about discriminatory or retaliatory employment actions *against her* that she in good faith and reasonably believed violated Title VII. As such, plaintiff's February 2006 email satisfies the first two prongs of her *prima facie* burden.

As the Second Circuit described in *Hicks v. Baines*, the Supreme Court now recognizes that "Title VII's anti-discrimination and anti-retaliation provisions 'are not coterminous'; anti-retaliation protection is broader and 'extends beyond workplace-related or employment-related retaliatory acts and harm.' " 593 F.3d 159, 165 (2d Cir. 2010) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006)).  In a Title VII retaliation claim, an adverse employment action is one that is "materially adverse to a reasonable employee or job applicant." *Id.* (quoting *White*, 548 U.S. at 57) (internal quotation marks omitted).  "Actions are 'materially adverse' if they are 'harmful to the point that they could well dissuade a reasonable working from making or supporting a charge of discrimination.' " *Id.* (quoting *White*, 548 U.S. at 57).  Although Title VII "does not set forth a general civility code for the American workplace," *id.* (quoting *White*, 548 U.S. at 68–69), "the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Id.* (quoting *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 227 (2d Cir. 2006)).

As described above, "a plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) (quoting *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545,

554 (2d Cir. 2001)).  Furthermore, evidence of actions that occurred outside the statute of limitations period is appropriate to consider when evaluating causality in a Title VII retaliation claim.  *See Curran v. All Waste Sys., Inc.*, 213 F.3d 625, 2000 WL 639999 at *4 (2d Cir. 2000) (table decision).  Nevertheless, "where 'timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.' " *Hartley v. Rubio*, 785 F. Supp. 2d 165, 182 (S.D.N.Y. 2011) (quoting *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001)).

Although plaintiff does not connect her February 16, 2006, email to any specific action taken against her, plaintiff's evidence shows that she was subjected to a lengthy interrogation on March 2, 2006, and that she was issued a letter of reprimand on April 19, 2006.[10]  Furthermore, a jury could also find that her February 16 email was followed by the same allegedly retaliatory adverse employment actions about which DOL concedes there exist outstanding issues of material fact.  Plaintiff took two extended medical leaves of absence between her February 16 email and the filing of the instant action.  Specifically, plaintiff was out from March 3 until April 18, and again from May 9 until September 25.  These uncontroverted facts show that plaintiff was at work for only 24 days between the email and the filing of her complaint.  DOL concedes  issues of material fact exist as to whether DOL's actions after September 25, 2006 were taken in retaliation for her filing the instant action, and so there must also be issues of material fact as to whether they were taken in retaliation for her February 16 email.  DOL's motion for partial summary judgment on

---

[10] In support of her responses, plaintiff also submits a copy of a notice of interrogation with her signature in the upper right-hand corner, indicating that she received it on February 16, the same day she sent the email.  However, the notice is dated February 15, and plaintiff does not contend that the notice was written before she sent her February 16 email.

plaintiff's Title VII retaliation claim must therefore be denied, but only insofar as it seeks judgment

on acts taken between February 16 and July 24, 2006.

E.      Title VI Retaliation Claim Against DOL

Title VI states that "[n]o person in the United States shall, on the ground of race, color, or

national origin, be excluded from participation in, be denied the benefits of, or be subjected to

discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C.

§2000d.  In an order granting plaintiff's motion to amend her complaint, Magistrate Judge Andrew

T. Baxter held that DOL's involvement with the One Stop center, which received federal funding

under the Workforce Investment Act of 1988, was sufficient to establish the applicability of Title

VI to it in the present action.

"Allegations of employment discrimination under Title VI are analyzed under the same

three-part burden shifting framework of *McDonnell Douglas* as Title VII claims." *Dorcely v.*

*Wyandanch Union Free Sch. Dist.*, 665 F. Supp. 2d 178, 218 (E.D.N.Y. 2009) (quoting *Pacheco v.*

*New York Presbyterian Hosp.*, 593 F. Supp. 2d 599, 629 (S.D.N.Y. 2009)).  As such, "[t]o make a

claim for Title VI retaliation, Plaintiff must show: (1) 'participation in a protected activity known to

defendants; (2) adverse action by the defendants against the plaintiff; and (3) a causal connection

between the plaintiff's protective activity and the defendants' adverse action.' " *Simpson ex rel.*

*Simpson v. Uniondale Union Free School Dist.*, 702 F. Supp. 2d 122, 134 (E.D.N.Y. 2010) (quoting

*McKie v. New York Univ.*, No. 94-cv-8510, 2000 WL 1521200 at *4 (S.D.N.Y. Oct. 13, 2000)).  In

her response, plaintiff details a long line of complaints she made to DOL management about its

treatment of LEP customers, and associates those complaints with responsive actions such as

informal reprimands, investigations, and several formal punishments.  Nevertheless, to demonstrate

46

retaliation under Title VI, plaintiff must still show that her complaints to management were in fact "protected activity."

By analogy to Title VII, to demonstrate participation in a protected activity under Title VI, a plaintiff need only have "a good faith, reasonable belief that he was opposing an employment practice made unlawful" by Title VI.  *See McMenemy v. City of Rochester*, 241 F.3d 279, 285 (2d Cir. 2001).  Plaintiff's deposition testimony and supporting exhibits are sufficient to raise an issue of material fact as to whether plaintiff made her complaints about DOL's treatment of LEP customers in good faith.  Therefore, the only remaining issue is whether plaintiff's belief was reasonable—an objective question related to but not dependent upon the legality of the conduct plaintiff questioned in her complaints.  *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1178–80 (2d Cir. 1996); *see Jordan v. Alt. Res. Corp.*, 458 F.3d 332, 339 (4th Cir. 2006) ("Because the analysis for determining whether an employee reasonably believes a practice is unlawful is an objective one, the issue may be resolved as a matter of law.").

DOL argues that plaintiff's Title VI claim should be dismissed because the discrimination plaintiff complained about at One Stop was based on disparate impact, not intentional discrimination, at essence disputing whether plaintiff's evidence can show that her complaints of Title VI discrimination were reasonable.  In *Alexander v. Sandoval*, 532 U.S. 275 (2001), the Supreme Court considered whether a private citizen could sue the State of Alabama under Title VI for the disparate impact an amendment to its state constitution making English the state's official language had on non-English speakers.  *Id.* at 278–79.  The Court held that "[n]either as originally enacted nor as later amended does Title VI display an intent to create a freestanding private right of action to enforce regulations promulgated under" Title VI.  *Id.* at 293.  In so doing, the Court

47

recognized that it is "beyond dispute" that 42 U.S.C. § 2000d "prohibits *only* intentional discrimination." *Id.* at 280 (emphasis added).

As DOL argues, many of plaintiff's complaints regarding One Stop policies and procedures focused on their disparate impact on Hispanic LEP customers, not intentional discrimination. These complaints, therefore, do not support a finding that plaintiff's belief that DOL was violating Title VI was reasonable. Even assuming that standing *alone* would be too technical a concept to justify summary judgment on these complaints, *see generally Hickey v. Myers*, 3:09-cv-1307 (TJM/DEP), 2010 WL 786459 at *3–5 (N.D.N.Y. Mar. 2, 2010) (denying motion to dismiss plaintiff's claim that he was retaliated against for complaining about a university's allegedly discriminatory admissions practices), plaintiff's evidence is still insufficient to overcome DOL's motion. The reason is fundamental: Plaintiff does not provide evidence that *any* Hispanic customers were actually *excluded* from services that DOL provided because of their race or national origin.

Plaintiff's complaint is rife with damning statements about DOL's conduct, but almost never substantiated with specifics. For example, Plaintiff relies on an email dated December 21, 2005, to support her contention that she opposed what she believed was DOL's "illegal" willingness to allow family members to translate on behalf of customers. In this email, Cheryl Kane writes that she asked plaintiff to forward her documentation to show that this activity was illegal, but that plaintiff "did not provide" any such document and "mentioned that [Kane] could call somebody." Plaintiff submits evidence indicating that she made a formal complaint within DOL about the Syracuse One Stop regarding its allegedly discriminatory acts, but when an administrator sought details as to "dates, time, what was said to her and any witnesses to any of the

alleged acts," plaintiff did not respond.  After two months of waiting, the administrator closed the investigation.  Plaintiff further offers an email she sent to Stucco where she purports to list thirteen LEP customers who she claims "were referred to intensive services but received none."  However, plaintiff does not bother to explain in the email or in her response submissions how this alleged denial of service is in any way related to race or national origin.  As DOL argues in its reply, plaintiff selectively quotes in her response an email from Hopkins to Kane dated November 7, 2005, omitting a critical observation: "You have given [plaintiff] opportunities to discuss her concerns and she has chosen not to do so.  If and when she files a discrimination complaint, an investigation will be conducted and the truth will prevail."  Indeed, much of plaintiff's opposition to defendants' motions follows this pattern—accusations without sufficient detail.

Even when she does provide sufficient detail to glean the nature of her allegations about an incident, plaintiff's complaints do not describe conduct that appears to violate Title VI.  First, plaintiff alleges that Nancy Bravo was "routed to Alvaro Valencia, the CNY staff member designated to assist new Spanish speaking customers because she had a Spanish sounding surname and because she looked Hispanic even though she was fully bilingual."  In support of this conclusion, plaintiff cites her own deposition testimony, and deposition testimony from Kane to the effect that she could not recall the incident.  However, in her response to DOL's motion, plaintiff does not elaborate on how Bravo was refused services or denied access because she was allegedly identified as Hispanic.  The email chain plaintiff attaches as exhibit 38 to her response indicates that Bravo experienced a delay in receiving services, but that many One Stop customers, Hispanic or otherwise, routinely experience similar delays.  Plaintiff's evidence does not support the conclusion that Bravo was denied access or services *because of* her Hispanic cultural or racial

49

affiliation, and as such, plaintiff cannot show that she had a reasonable belief that DOL's actions violated Title VI.

Second, plaintiff alleges that she complained to DOL upper management that "the Syracuse One Stop could not properly utilize the Interpretalk service to accommodate LEP customers," referring to a third party fee-based telephonic translation service.  In support of her claim, plaintiff offers substantial evidence indicating that she did indeed complain about One Stop not using Interpretalk.  Nevertheless, plaintiff does not allege or offer any evidence suggesting that a customer requested to use Interpretalk and was denied, or even how an LEP customer's face-to-face use of One Stop services would improve if DOL used Interpretalk more frequently.  Plaintiff acknowledges that she, Alvaro Valencia, and Manny Martinez all spoke Spanish with customers at One Stop, and her evidence indicates that she and Valencia were expected to do so on a regular basis.  Again, plaintiff's evidence is insufficient to support a finding that her belief that DOL was violating Title VI was reasonable.

Lastly, plaintiff alleges that Alvaro Valencia, a CNY employee, stated that if customers "don't speak English, we don't help them here [at One Stop].  They have to go to the Spanish Action League or to Jobs Plus."  Plaintiff attaches deposition testimony from Valencia where, in response to the question of whether or not he uttered the statement, Valencia stated "I think so, yeah."  Though the statement, if true, is suggestive of conduct that may be at odds with Title VI, there is again no evidence that any customer who could have received services at One Stop was turned away because he or she did not speak English.  Email chains and deposition testimony show that Valencia's supervisor at CNY denied that his statement reflected policy and practice.  The statement itself contradicts plaintiff's other assertions, particularly that Valencia serviced *so many*

LEP customers that a disproportionate number of Hispanic customers experienced an inappropriate delay in receiving services.  As with plaintiff's other accusations, in response to plaintiff's complaint about Valencia's statement, DOL management asked her to forward specific information about the incident.  Whether she did is not apparent from the record, as there are no examples of individuals being denied services because of their ethnicity, ancestry, or even their language skills. The evidence plaintiff offers again fails to support her claim that she had a reasonable belief that DOL was violating Title VI.

The Court has scoured the record and has been unable to find any support for the contention that plaintiff's belief that DOL was violating Title VI was reasonable, just as it could find no evidence of pretext in plaintiff's Title VII intentional discrimination claim.  Indeed, that plaintiff may be able to demonstrate that English-speaking customers were equipped to make more efficient use of the services provided at One Stop does not support a finding that plaintiff had a *reasonable* belief that DOL discriminated against Hispanic customers.  *Cf. Soberal-Perez v. Heckler*, 717 F.2d 36 (2d Cir. 1983) (describing how language barriers alone are insufficient to support a claim of intentional discrimination).  Indeed, at deposition with CNY, plaintiff herself testified that she "could only speculate" as to whether One Stop intentionally discriminated against LEP customers. Because plaintiff cannot demonstrate that DOL was engaged in any activity that could reasonably be considered violative of Title VI retaliation claim against DOL must be dismissed.

F.    Title VI Retaliation Claim Against CNY

CNY argues that plaintiff's Title VI claim against it should be dismissed because plaintiff has not set forth a *prima facie* case of Title VI retaliation.  "To make a claim for Title VI retaliation, plaintiff must show: (1) 'participation in a protected activity known to defendants; (2) adverse

action by the defendants against the plaintiff; and (3) a causal connection between the plaintiff's

protective activity and the defendants' adverse action.' " *Simpson ex rel. Simpson*, 702 F. Supp. 2d

at 134 (E.D.N.Y. 2010) (quoting *McKie*, 2000 WL 1521200 at *4).   Furthermore, "[a]llegations of

employment discrimination under Title VI are analyzed under the same three-part burden shifting

framework of *McDonnell Douglas* as Title VII claims."   *Dorcely*, 665 F. Supp. 2d at 218 (E.D.N.Y.

2009) (quoting *Pacheco*, 593 F. Supp. 2d at 629).   CNY argues that it is not plaintiff's employer,

and so it could not have taken any adverse action against plaintiff, and that plaintiff has not offered

evidence giving rise to the presumption that any adverse action taken was born of a discriminatory

animus

     Title VII of the Civil Rights Act of 1964 prohibits discrimination based on race, color,

religion, sex or national origin by an employer, employment agency, or labor organization.   42

U.S.C. § 2000e–2. (Emphasis added) In determining whether or not a party is an "employer" for

purposes of liability under Title VII, courts consider: "whether the party had authority to hire or fire

the plaintiff, supervise her work or conditions of employment, determine her rate or method of pay,

or maintain records of her employment.*"   Bordeau v. Housing Works, Inc*., 2001 U.S. Dist. Lexis

5313 at *13, 2001 WL 943316 (S.D.N.Y. 2001) (citing *Kern v. City of Rochester*, 93 F.3d 38, 45

(2d Cir. 1996)).   In the instant case, the record demonstrates that CNY Works: (1) had no authority

to hire or fire the plaintiff; (2) did not supervise her work or conditions of employment; (3) did not

determine her rate or method of pay; and (4) did not maintain records of her employment.   Based on

this evidence, the Court finds that CNY Works was not the plaintiff's employer.

     Nor can CNY Works be considered a coemployer or joint employer.   An employer may be

considered a joint or co-employer where there is evidence that the putative employer "had

immediate control over the other [entity]'s employees." *NLRB v. Solid Waste Services, Inc.*, 38 F.3d 93, 94 (2nd Cir.1994).  To establish a "joint employer" relationship between two entities, a plaintiff must allege "commonality of hiring, firing, discipline, pay, insurance, records, and supervision ...." *Lima v. Addeco*, 634 F.Supp.2d 394, 399–400 (S.D.N.Y.2009), *aff'd* 375 Fed. Appx. 54 (2d Cir. 2010).  In the instant case, there is no evidence that CNY Works shared any commonality of hiring, firing, discipline, pay, insurance, record keeping, or supervision with DOL.  That DOL and CNY Works shared office space, funding, common purposes, customer service and work is not dispositive of a legal employment relationship between employees and employers of each company.  Because there is no evidence that CNY Works played any role in plaintiff's employment, the Court finds that she has failed to establish that the CNY Works was her joint or co-employer.

In any event, even if this were not true, plaintiff fails to meet the other elements of a prima facie case against CNY Works under Title VI.  She has failed to present any evidence to support a finding that CNY took an adverse action against her in violation of Title VI.  An "adverse action" in the context of a Title VI or Title VII retaliation claim is an action that would "dissuade[] a reasonable worker from supporting a charge for discrimination," as distinct from "trivial harms" such as "those petty slights or minor annoyances that often take place at work that all employees experience." *Burlington*, 548 U.S. at 67–68.  Many of the perceived or actual conflicts plaintiff describes in her deposition testimony and response — for example, that a CNY coworker would "shush" her or that CNY director Lenore Sealy commented "never a dull moment" in reference to plaintiff — are precisely those "petty slights" that do not support a claim for retaliation.  *See id.* Plaintiff states in her response that CNY manager Manny Martinez wanted her transferred "out of

CNY Works," but nowhere does she claim that Martinez actually caused her to be transferred. Plaintiff also states in her response that she had a dispute with Lori Wilson over whether she could put Spanish-language pamphlets in the One Stop lobby area, but does not claim that Wilson caused her to be reprimanded or even punished.  Whether considered individually or in aggregate, plaintiff describes no facts upon which a jury could find that a reasonable employee in plaintiff's position would be dissuaded from filing a charge of discrimination against CNY because of the actions it allegedly took against her.

Plaintiff's failure to demonstrate any adverse action taken by CNY relieves it of the burden to offer any explanation for its actions, but even if its actions were "adverse" within the meaning of Title VI, plaintiff's evidence does not overcome her *prima facie* burden.  For example, plaintiff argues that DOL considered Sealy and Wilson's communications with plaintiff's supervisors about her refusal to leave at her scheduled 4:30 p.m. end time in electing to terminate plaintiff's employment.  Even if CNY committed an adverse act by communicating plaintiff's misconduct to DOL, plaintiff offers no evidence connecting that act with her perceived or actual ability to lodge a discrimination complaint, let alone any discriminatory animus.

Finally, as has been already discussed at length above, plaintiff did not engage in any protected activity under Title VI in the first place.  CNY's motion for summary judgment must therefore be granted in its entirety, and it must be dismissed as a defendant to this action.

G.    Compliance with Local Rule 8.1

Under Federal Rule of Civil Procedure 83, District Courts are empowered to promulgate local rules "consistent with . . . federal statutes and rules adopted under 28 U.S.C. §§ 2072 and 2075."  Pursuant to this authority, the Northern District of New York adopted and published Local

Rule 8.1, which states: "Parties shall refrain from including, or shall redact where inclusion is necessary, the following personal identifiers[:] . . . 1. Social security numbers[,] . . . 2. Names of minor children[, and] . . . 5. Home addresses."  N.D.N.Y. L.R. 8.1.  The Rule further requires that "a party wishing to file a document containing [these] personal data identifiers may 1. file an unredacted version of the document under seal, or 2. file a reference list under seal."  *Id.*

Plaintiff's voluminous unsealed submissions contain numerous unredacted personal data identifiers listed in Local Rule 8.1.  While "the responsibility for redacting these personal identifiers **rests solely with counsel and the parties**," the Court is troubled to discover that some of the personal data identifiers in the record belong to third parties unconnected to the instant action.  *Id.* (emphasis in original).  "Local rules *have the force of law*, as long as they do not conflict with a rule prescribed by the Supreme Court, Congress, or the Constitution," *Contino v. U.S.*, 535 F.3d 124, 126 (2d Cir. 2008) (citing *United States v. Yonkers Bd. of Educ.*, 747 F.2d 111, 112 (2d Cir. 1984)) (emphasis added), and Local Rule 8.1 cautions "that failure to redact these personal identifiers may subject [parites] to the Court's full disciplinary power."  N.D.N.Y. L.R. 8.1.  The Court therefore urges the parties to redact personal identifiers in all future unsealed electronic submissions, or if they are necessary, follow the procedure set forth in Local Rule 8.1. The parties are reminded that **the failure to do so is sanctionable conduct**. *See* N.D.N.Y. L.R. 1.1(d).

## IV.    CONCLUSION

Based on the foregoing, it is hereby

ORDERED that the motion for partial summary judgment (Dkt. No. 81) by defendant DOL dismissing plaintiff's Title VII intentional discrimination claim, plaintiff's Title VI retaliation claim, and part of plaintiff's Title VII retaliation claim be GRANTED, except insofar as it seeks

judgment on plaintiff's Title VII retaliation claim based on actions occurring between February 16 and July 24, 2006, and

ORDERED that the motion for summary judgment (Dkt. No. 79) by defendant CNY dismissing plaintiff's Title VI retaliation claim be GRANTED in its entirety.

IT IS SO ORDERED.

Date:   March 30, 2012

_____
Honorable Norman A. Mordue
U.S. District Judge